RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5294-13T2

IN THE MATTER OF THE CIVIL
COMMITMENT OF J.A., SVP-528-09.
_______________________________

 Submitted February 16, 2017 – Decided March 24, 2017

 Before Judges Hoffman, O'Connor and Whipple.

 On appeal from Superior Court of New Jersey,
 Law Division, Essex County, Docket No. SVP-
 528-09.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Vincent J. Bochis, Designated
 Counsel, on the brief).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Melissa H. Raksa,
 Assistant Attorney General, of counsel;
 Stephen Slocum, Deputy Attorney General, on
 the brief).

PER CURIAM

 Appellant, who is now fifty-three years of age, appeals

from a June 5, 2014 judgment continuing his involuntary

commitment to the Special Treatment Unit (STU) pursuant to the

New Jersey Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-

27.24 to -27.38. We affirm.
 I.

 We discern the following facts from the record.1

Appellant's history of sexual misconduct began in the 1980s.

First, on December 10, 1983, when appellant was twenty years

old, his seventeen-year-old former girlfriend reported he

sexually penetrated her against her will in his apartment.

Shortly thereafter, on April 21, 1984, appellant reportedly

pulled his car alongside a woman, D.B., and her four-year-old

son and five-year-old daughter. Appellant exited his car and

proceeded to grab the boy and pull him towards the vehicle; he

also rubbed D.B.'s hair, breasts, and buttocks. On that same

date, appellant stopped M.N., a fourteen-year-old girl, and

asked her for directions. She entered appellant's car and he

drove her to a cemetery where he pushed her down and attempted

to unzip her jeans.

 According to the State's 2009 petition for civil

commitment, police charged appellant in April 1984 with three

counts of sexual contact, unlawful possession of a weapon,

kidnapping, and attempted sexual assault; appellant pled guilty

to one count of sexual assault and one count of unlawful

possession of a weapon.

1
 For the most part, the pertinent facts are set forth in the
State's petition and appellant's various psychiatric
evaluations. These reports contain some slight factual
inconsistencies, but none of significance.
 2 A-5294-13T2
 Next, while he was in California and on probation, on March

30, 1994, police charged appellant with sexual battery, fraud,

and annoying phone calls. According to Dr. Dean DeCrisce's 2010

report, appellant pled guilty to charges relating to fraud and

the phone calls.

 On August 23, 1995, K.O. reported to police in Bellevue,

Washington that she met appellant at his apartment for a dinner

date. Appellant attempted to kiss her, but she refused and

struggled with him, during which time appellant fondled her

breasts. When K.O. later attempted to leave, appellant followed

her to the door and again fondled her. Shortly thereafter, on

September 26, 1995, B.L., an adult woman, told police appellant

asked her for a ride home from an Alcoholics Anonymous meeting.

Appellant refused to leave her car when she arrived at his

apartment and instead attempted to kiss her. He further tried

to climb on her lap and fondled her breasts as they struggled.

Appellant received two charges for "Indecent Liberties" for

these incidents and was sentenced to a term of incarceration.

 On January 6, 1997, appellant exposed himself to a hotel

worker and attempted to restrain her from leaving his bathroom.

Appellant pled guilty to lewdness for this incident.

 Next, on or about January 3, 1998, appellant approached

sixteen-year-old Z.Y. at an Atlantic City casino and

 3 A-5294-13T2
impersonated a security guard. Appellant brought Z.Y. to an

elevator, where he attempted to grope her against her will.

According to the State's petition, appellant was convicted of

child abuse for this offense.

 On September 16, 2001, twenty-one-year-old C.R. reported to

police that appellant brought her to the dressing room of a

store and inserted his finger in her vagina. Appellant was

acquitted of all charges stemming from this incident.

 On April 14, 2003, Q.K., a nineteen-year-old patient at

Hampton Hospital, told a staff member that appellant went to her

room after they watched television together. Appellant coaxed

her into the bathroom where he locked the door and fondled her

breasts. Police arrested appellant and charged him with

criminal sexual contact; however, he was convicted of a

downgraded charge of harassment.

 Appellant also has a history of arrests, charges, and

convictions for non-sexual offenses, including criminal

mischief, disorderly conduct, resisting arrest, battery,

disturbing the peace, and vandalism. He has a significant

history of alcohol abuse. According to the psychological

evaluations, appellant attributes most of his sexual offending

to his alcohol use.

 4 A-5294-13T2
 On March 9, 2008, appellant committed the "predicate

offense" that led to his initial confinement in the STU. On

this date, appellant approached a female patron at a casino in

Atlantic City and told her he could help her obtain a new

player's club card. The patron followed appellant to a

stairwell where he forced her against a wall and digitally

penetrated her vagina. Appellant pled guilty to fourth-degree

criminal sexual contact, N.J.S.A. 2C:14-3(b), and the court

sentenced him to eighteen months of incarceration.2

 On May 8, 2009, prior to the expiration of appellant's

criminal sentence, the State moved for appellant's civil

commitment under the SVPA. The court entered a temporary order

of commitment on May 13, 2009. In reviewing appellant's

commitment, the court considered Dr. DeCrisce's 2010 evaluation,

which noted that "a number of conditions might be placed upon

[appellant] to reduce his risk below the highly likely [to re-

offend sexually] threshold."

 On July 6, 2010, Judge James F. Mulvihill entered a consent

order creating a plan for appellant's conditional discharge.

The parties agreed appellant was subject to commitment under the

SVPA, but stipulated, "[W]ith the imposition of certain

2
 Appellant applied for post-conviction relief in 2010, which
the court granted, vacating his conviction. Appellant then
entered a new plea for criminal trespass.

 5 A-5294-13T2
conditions, he is not highly likely to reoffend and therefore

does not require indefinite commitment to the [STU]." As such,

the court required appellant to seek inpatient treatment for his

alcoholism. Upon discharge from the STU or inpatient treatment,

he was subject to "the functional equivalent of those conditions

imposed under Parole Supervision for Life and which may include

. . . electronic monitoring."

 On October 26, 2010, the court entered a consent order3

discharging appellant from the STU and sending him to reside at

the America's Keswick facility (Keswick). The court reiterated

the requirement that appellant "cooperate with and abide by

Parole supervision, as if he were on Parole Supervision for

Life."

 On January 3, 2011, appellant returned to the STU after he

engaged in a verbal confrontation with another Keswick resident.

The court returned appellant to Keswick by order dated July 28,

2011. On February 14, 2012, Judge Mulvihill denied appellant's

request to move to Philadelphia. Keswick discharged appellant

to an outpatient program around March 2012. On April 10, 2012,

the court entered a consent order, permitting appellant to live

at any residence approved by parole. Appellant remained subject

to parole conditions upon his release.

3
 The court entered an amended order on October 29, 2010.
 6 A-5294-13T2
 On June 10, 2012, appellant cut the GPS monitoring device

from his ankle and travelled to Atlantic City, where he became

intoxicated. Police arrested him the next morning, and the

court returned him to the STU on June 14, 2012. Appellant

claims he removed the bracelet, in part, because of the "intense

pain" it caused him.

 Judge Philip M. Freedman conducted a review hearing of

appellant's commitment on December 5 and 6, 2012. During the

December 5 hearing, the judge noted the court had vacated

appellant's March 2008 predicate offense for sexual contact,

prompting him to ask counsel for a new predicate offense to

justify appellant's commitment. The court then identified

appellant's 1984 conviction for "two counts of sexual contact

. . . [f]or which he pled guilty on June 18, 1984," as "the only

one . . . that meets the definition of . . . a sexually violent

offense" under N.J.S.A. 2C:30:4-27.26(a). The judge allowed the

State to amend its petition to establish this conviction as the

predicate offense.

 The State presented testimony from Dr. DeCrisce and another

expert. Dr. DeCrisce acknowledged his previous recommendation

but said the Atlantic City incident changed his mind, stating,

"[T]here's nothing . . . that can mitigate [appellant's] risk,

other than institutionalization at this facility for intensive

 7 A-5294-13T2
treatment that addresses both the personality disorder and the

substance abuse and the sexual offending." Appellant also

presented expert testimony.

 Judge Freedman rendered his oral findings on January 10 and

11, 2013. The judge found by clear and convincing evidence that

appellant required commitment under the SVPA. The judge

essentially agreed with Dr. DeCrisce's analysis, noting that

appellant "cut off his GPS, went right back to the scene of the

crime, so to speak, and started drinking. And there's no better

evidence [that appellant cannot] be controlled in the

community." As such, the court entered judgment on January 11,

2013, committing appellant to the STU. Appellant appealed, but

he withdrew the appeal on July 9, 2013.

 Prior to the entry of the judgment under review, Judge

Freedman reviewed appellant's status at a hearing on May 28,

2014. At this hearing, the State presented expert testimony

from Alberto M. Goldwaser, M.D., and psychologist Debra Roquet,

Psy.D. Appellant presented expert testimony from Christopher P.

Lorah, Ph.D., and presented lay testimony from Brian Nolan, an

investigator from the Office of the Public Defender.

 Dr. Goldwaser evaluated appellant on May 19, 2014, for

approximately ninety minutes and prepared a report detailing his

findings. He first testified regarding appellant's history of

 8 A-5294-13T2
sexual offenses, noting they were all "characterized as . . .

very similar ways of behaving." Dr. Goldwaser noted appellant's

"urge to proceed . . . in this particular sexual manner, is

overwhelming to him. He cannot control it."

 Dr. Goldwaser diagnosed appellant with "substance use

disorder, alcohol, severe, currently in controlled environment."

He said this substance use disorder does not cause appellant to

commit sexual offenses by itself, but "decreases inhibitions"

and "emboldens somebody to do whatever one wants to do." He

noted substance abuse treatment is available at the STU. The

doctor described the events leading to appellant's 2012 arrest

in Atlantic City and noted appellant "has been doing really very

poorly" since returning to the STU. He said appellant had not

shown interest in addressing his sexual offenses or substance

abuse issues.

 Dr. Goldwaser further diagnosed appellant with "unspecified

paraphilic disorder coercion non[-]consent in controlled

environment" and antisocial personality disorder. He determined

appellant experiences sexual urges "involving sexual arousal to

person[s] who by virtue of his employed force or their age are

unable to consent." Dr. Goldwaser said appellant's disorder was

"chronic" and would not remit on its own.

 9 A-5294-13T2
 Regarding the antisocial personality disorder, Dr.

Goldwaser found appellant's behavior demonstrated a pattern of

disregard for the rights of others. He found appellant failed

to conform to social norms based on his "repetitively performing

acts that are grounds for arrest" and that appellant

demonstrated a lack of empathy or remorse. The doctor noted

this condition "does not remit by itself."

 Dr. Goldwaser found appellant was "highly likely" to re-

offend unless confined to a secure facility for treatment. He

based this conclusion on appellant's sex-offense history, his

relapse after months of alcohol rehabilitation treatment, and

his non-sexual offenses. He scored appellant as a seven4 on the

Static-99R test, an actuarial measure of relative risk for

sexual offense recidivism, placing him on the high range for

sexually re-offending.

 Dr. Roquet interviewed appellant on October 8, 2013, as a

member of the STU Treatment Progress Review Committee, reviewed

prior records, and prepared a report of her findings. Dr.

Roquet diagnosed appellant with sexual disorder NOS, alcohol

dependence in a controlled environment, and antisocial

personality disorder. Dr. Roquet found "similarities" in

4
 Dr. Goldwaser testified to a score of seven, but his report
indicates he scored Appellant as an eight on the Static-99R
test.
 10 A-5294-13T2
appellant's sexual offenses, noting, "Once he has the woman

within his circle of control, he acts in a sexually aggressive

manner." She noted appellant's substance abuse did not explain

his sexual offenses, describing "a pattern of sexual behavior

that is . . . a sexual pathology."

 Dr. Roquet concluded appellant was a "[h]igh risk" to

reoffend unless confined in a secure facility. She based this

conclusion on appellant's violations of probation and

supervision, including his incident involving the GPS bracelet,

his antisocial personality, and his score of seven on Static-99R

test.

 Dr. Lorah interviewed appellant on January 8, 2014, for

approximately ninety minutes and prepared a report of his

findings. Doctor Lorah diagnosed appellant with alcohol

dependence in sustained full remission in a controlled

environment and bipolar II disorder. He declined to diagnose

paraphilia or other sexual disorders, stating, "I believe that

the majority of [appellant's] illegal sexual behavior is

strongly attributable to his alcohol abuse."

 Dr. Lorah found appellant did not demonstrate antisocial

personality disorder because "he engages in this type of

behavior when he drinks." He acknowledged appellant engaged in

high-risk behavior by drinking in Atlantic City, but noted

 11 A-5294-13T2
appellant did not commit a sex offense during this incident.

However, Dr. Lorah acknowledged that alcoholism does not cause

sex offending and further identified appellant's alcohol abuse

as a "contributing factor" for his sex offending "[a]s opposed

to a causal factor."

 Nolan testified regarding his investigation of appellant's

discharge options. He said appellant's mother was willing to

let appellant stay with her.

 Based on the expert proofs, Judge Freedman found by clear

and convincing evidence that appellant required continued

commitment in the STU. The judge incorporated by reference his

previous opinion from January 2013 and then reviewed the

testimony presented during the current hearing. He determined

both State witnesses were credible and rejected Dr. Lorah's

testimony that appellant's sexual offenses were related to his

alcohol use. The judge concluded appellant suffered from mental

abnormalities predisposing him to engage in acts of sexual

violence; if released, he would be highly likely to engage in

sexually violent acts "within the reasonably foreseeable

future."

 Accordingly, Judge Freedman entered an order, continuing

appellant's commitment in the STU. This appeal followed.

 12 A-5294-13T2
 II.

 The Legislature's purpose in enacting the SVPA was "to

protect other members of society from the danger posed by

sexually violent predators." In re Civil Commitment of J.M.B.,

197 N.J. 563, 570-71 (citing N.J.S.A. 30:4-27.25), cert. denied,

558 U.S. 999, 130 S. Ct. 509, 175 L. Ed. 2d 361 (2009). Thus,

the SVPA provides for the involuntary commitment of any person

deemed by the court to be a sexually violent predator within the

meaning of the statute. N.J.S.A. 30:4-27.32(a). The statute

defines a sexually violent predator as:

 a person who has been convicted, adjudicated
 delinquent or found not guilty by reason of
 insanity for commission of a sexually
 violent offense . . . and suffers from a
 mental abnormality or personality disorder
 that makes the person likely to engage in
 acts of sexual violence if not confined in a
 secure facility for control, care and
 treatment.

 [N.J.S.A. 30:4-27.26.]

 To warrant commitment of an individual under the SVPA, the

State must prove "the individual has serious difficulty in

controlling sexually harmful behavior such that it is highly

likely that he or she will not control his or her sexually

violent behavior and will reoffend." In re Commitment of W.Z.,

173 N.J. 109, 132 (2002). The court must consider the

individual's "present serious difficulty with control over

 13 A-5294-13T2
dangerous sexual behavior[,]" and the State must establish "by

clear and convincing evidence . . . that it is highly likely

that the person . . . will reoffend." Id. at 132-34 (emphasis

in original).

 Our review of a trial court's decision in a commitment

proceeding under the SVPA is "exceedingly narrow." In re Civil

Commitment of W.X.C., 407 N.J. Super. 619, 630 (App. Div. 2009)

(citing In re Civil Commitment of J.M.B., 395 N.J. Super. 69, 89

(App. Div. 2007), aff'd, 197 N.J. 563 (2009); In re Civil

Commitment of V.A., 357 N.J. Super. 55, 63 (App. Div.), certif.

denied, 177 N.J. 490 (2003)), aff'd, 204 N.J. 179 (2010), cert.

denied, 562 U.S. 1297, 131 S. Ct. 1702, 179 L. Ed. 2d 635

(2011). Further, we "must give the 'utmost deference' to the

reviewing judge's determination of the appropriate balancing of

societal interest and individual liberty." Ibid. (citing In re

Commitment of J.P., 339 N.J. Super. 443, 459 (App. Div. 2001)).

Modification is only proper on appeal when the record reveals a

clear abuse of discretion. Ibid. (citing J.M.B., supra, 395

N.J. Super. at 90). Accordingly, the reviewing court has a

responsibility to "canvass the record, inclusive of the expert

testimony, to determine whether the findings made by the trial

judge were clearly erroneous." Ibid. (citing In re D.C., 146

N.J. 31, 58-59 (1996)).

 14 A-5294-13T2
 Appellant argues Judge Mulvihill established the "law of

the case" with his 2010 consent order, finding appellant was a

sexually violent predator who, "with the imposition of certain

conditions[,] . . . is not likely to reoffend and therefore does

not require indefinite commitment to the [STU]." Appellant

raises several arguments based on this determination,

challenging the court's findings prior to the June 5, 2014

judgment at issue on appeal.

 Specifically, appellant argues the State, STU, and Dr.

DeCrisce "abandoned" him by failing to arrange appropriate

treatment services upon his conditional discharge. Appellant

further contends his discharge violations for non-sexual

behavior did not provide sufficient basis for the review courts

to reject the "law of the case" and recommit him to the STU.

See In re Civil Commitment of E.D., 183 N.J. 536, 551 (2005)

(holding that "in order for the State to cause the recommitment

of a committee who has been conditionally discharged, the State

must establish by clear and convincing evidence that the

committee is highly likely not to control his or her sexually

violent behavior and will reoffend"). Appellant asserts the

2012 court erred by "blindly" accepting the opinions of the

State's experts that he "morphed from an individual who could be

 15 A-5294-13T2
rehabilitated in the community to someone in need of involuntary

civil commitment."

 We reject these arguments. The "law of the case" doctrine

"sometimes requires a decision of law made in a particular case

to be respected by all other lower or equal courts during the

pendency of that case." State v. Reldan, 100 N.J. 187, 203

(1985). However, this principal is not applicable to the

instant matter. The purpose of a review hearing, including

review hearings under the SVPA, is to evaluate a committee's

"current condition." See State v. Fields, 77 N.J. 282, 310

(1978). All prior evidence remains relevant, but "[t]he

reviewing judge must evaluate the current evidence submitted to

him in light of all evidence adduced in earlier proceedings."

Ibid.

 Therefore, given our deferential standard of review in

civil commitment matters, we find no basis to reverse the 2014

judgment continuing appellant's commitment. Substantial

evidence in the record supports the judge's finding that

appellant suffers from a mental abnormality making him highly

likely to sexually reoffend. W.Z., supra, 173 N.J. at 132. Dr.

Goldwaser diagnosed appellant with a paraphilic disorder due to

the clear pattern of violent behavior in appellant's sexual

offense history. He further diagnosed appellant with antisocial

 16 A-5294-13T2
personality disorder based on his failure to follow social norms

and his lack of empathy or remorse. Both conditions do not

spontaneously remit. Dr. Roquet similarly determined appellant

had a sexual pathology that she could not solely attribute to

his alcohol abuse. The experts determined appellant posed a

high likelihood to reoffend due to his conditions, offending

history, and relapse in Atlantic City. Based on the evidence in

the record, the trial judge did not abuse his discretion by

continuing appellant's commitment.

 Next, appellant argues the 2012 review court erred by using

his 1984 "sexual contact" convictions as the predicate offense

to justify confinement under the SVPA. See In re Commitment of

P.C., 349 N.J. Super. 569, 576 (App. Div. 2002) (noting

predicate offense is necessary for confinement). Our statutes

do not define "predicate offense"; instead, courts use this term

to refer to the crimes that qualify as sexually violent offenses

under N.J.S.A. 30:4-27.26(a) or (b). See, e.g., In re Civil

Commitment of P.Z.H., 377 N.J. Super. 458, 460, 463 (App. Div.

2005). As noted, the record of appellant's 1984 convictions is

unclear; although the State's petition says appellant pled

guilty to sexual assault, Judge Freedman determined appellant

was convicted of two counts of "sexual contact." However,

 17 A-5294-13T2
sexual assault and "criminal sexual contact" both constitute

"sexually violent offenses" under N.J.S.A. 30:4-27.26(a).

 Appellant's brief is inconsistent on this issue. In his

statement of facts, appellant suggests the record is unclear

whether he was actually convicted of "sexual contact" in 1984.

He also asserts the SVPA does not list sexual contact as a

predicate offense. Conversely, in his legal argument section,

appellant acknowledges his sexual contact conviction but

contends its "remoteness" should have precluded the court from

using it as the predicate offense.

 We conclude the record shows appellant was at least

convicted of sexual contact in 1984, thereby placing him under

the purview of the SVPA. See N.J.S.A. 30:4-27.26(a); State v.

Bellamy, 178 N.J. 127, 140 (2003) (noting a conviction for

"fourth-degree sexual contact" constitutes a predicate offense

under the SVPA). Moreover, we find appellant's "remoteness"

argument lacks merit. As appellant acknowledges, the SVPA and

New Jersey case law do not set a time limit for consideration of

predicate offenses. See In re Civil Commitment of R.Z.B., 392

N.J. Super. 22, 44 (App. Div.) ("Although we recognize that [the

appellant's] New York offenses occurred in the 1980's, the

passage of time does not eliminate their legal significance as

eligible prior convictions under the SVPA."), certif. denied,

 18 A-5294-13T2
192 N.J. 296 (2007). Instead, commitment under the SVPA focuses

on whether an individual poses a current threat; "[w]hile the

remoteness of the last predicate act may be relevant to that

inquiry, it also may be insignificant." P.Z.H., supra, 377 N.J.

Super. at 466.

 Here, although appellant's only clear conviction for a

crime of sexual violence dates back to 1984,5 both State experts

reviewed his full history of sexual-offense arrests, noting that

downgraded or dismissed offenses are still relevant to their

clinical diagnoses. The experts concluded appellant was a

current risk for reoffending, and the judge found their

testimony credible. Therefore, we decline to reverse on this

basis.

 Appellant further argues that if his 1984 conviction must

serve as the predicate offense, then the 2010 discharge

conditions requiring him to wear a GPS ankle device violated the

Ex Post Facto Clauses of the United States and New Jersey

Constitutions. The Ex Post Facto Clause prohibits the

5
 During his oral opinion on January 10, 2013, Judge Freedman
noted the Washington statute for "indecent liberties" contained
similar elements to the New Jersey crime of sexual contact.
N.J.S.A. 30:4-27.26(a) includes in its definition of sexually
violent offenses "a criminal offense with substantially the same
elements as any offense enumerated above." Judge Freedman
determined appellant's 1995 offenses in Washington met the New
Jersey definition of sexual contact, and therefore, we find
these convictions could also serve as the predicate offense.
 19 A-5294-13T2
legislature from "increase[ing] the punishment for a crime after

it has been committed." Riley v. N.J. State Parole Board, 219

N.J. 270, 274 (2014).

 In Riley, our Supreme Court held the Ex Post Facto Clause

barred the application of the Sex Offender Monitoring Act

(SOMA), N.J.S.A. 30:4-123.89 to -123.95, which the Legislature

passed in 2007, to an appellant's 1986 conviction for aggravated

sexual assault. Specifically, the Court held the appellant's

GPS ankle bracelet, which the Parole Board required he wear for

the rest of his life shortly after release from prison,

constituted an illegal additional punishment. Riley, supra, 219

N.J. at 274-75. Appellant urges the same result in the instant

matter.

 We reject this argument. In Riley, the Court specifically

distinguished the SOMA from the SVPA, stating,

 Unlike the [SVPA], which permits for yearly
 review to determine whether the committee
 continues to pose a danger to the public and
 which allows for his release if he does not,
 N.J.S.A. 30:4-27.35 to -27.36, SOMA ensures
 that [the appellant's] future is static — he
 is condemned to wear the electronic
 monitoring device for the rest of his life.

 [Id. at 294-95.]

Furthermore, under the SVPA, the trial court may impose

discharge conditions "for the purpose of ensuring that the

person . . . does not represent a risk to public safety."
 20 A-5294-13T2
N.J.S.A. 30:4-27.32(c)(2). "If the court imposes conditions for

a period exceeding six months, the court shall provide for a

review hearing on a date the court deems appropriate but in no

event later than six months from the date of the order." Ibid.

 Therefore, unlike the circumstances in Riley, appellant's

GPS bracelet was not a permanent punishment but a temporary

condition that the court imposed to ensure the public's safety.

Moreover, appellant agreed to conditions akin to parole

supervision as part of the 2010 consent orders. Because we find

Riley distinguishable, we decline to reverse on this basis.

 Finally, appellant advances a public policy argument,

asserting imposing indeterminate sentences on sex offenders

through involuntary commitment does not serve the interests of

justice under his circumstances. Appellant also reiterates his

challenges to the State and Dr. DeCrisce's treatment, arguing we

should notice plain error not raised below if it causes an

unjust result. See R. 2:10-2.

 These arguments lack merit. For the reasons discussed,

appellant's continuing commitment is entirely appropriate and

does not defy the interests of justice. We will not reverse on

this basis. Moreover, any arguments we did not specifically

address lack sufficient merit to warrant discussion in a written

opinion. See R. 2:11-3(e)(1)(E).

 21 A-5294-13T2
Affirmed.

 22 A-5294-13T2